**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

**No. 97-10984**
_____


**In the Matter of: VIKING ACCEPTANCE CORPORAITON,**

**Debtor.**

-------------------------------------------------------------

**CAPITOL RESOURCE FUNDING, INC.,**

**Appellee,**


**VERSUS**


**VIKING ACCEPTANCE CORPORATION,**

**Appellant.**


_____

Appeal from the United States District Court
For the Northern District of Texas
(3:96-CV-1619-T)
_____
December 9, 1998


Before DeMOSS, PARKER, and DENNIS, Circuit Judges.

DeMOSS, Circuit Judge:[*]

Viking Acceptance Corporation, the debtor in an underlying

Chapter 11 bankruptcy proceeding, appeals the district court's

---

[*] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

affirmance of the bankruptcy court's final judgment in this adversary proceeding. We affirm.

I.

The facts material to this complex piece of commercial litigation are voluminous and complicated. Fortunately, only a thumbnail sketch is required for our disposition of the issues presented on appeal. The claims litigated as an adversary proceeding in the bankruptcy court arose out of the parties' participation in the business of buying and selling commercial paper covering installment loan contracts on used cars. Viking Acceptance Corporation (Viking), the bankruptcy debtor in the underlying Chapter 11 bankruptcy, bought and sold, or brokered, automobile installment loan contracts. Corinthian Management, Inc. (Corinthian) provides administrative and managerial support for certain claim reimbursement trust accounts and warranty programs. Onyx Corporation (Onyx), which is affiliated with Viking, was formed to manage a loan program developed jointly by Viking and Corinthian. Homestead Insurance Company (Homestead), which is affiliated with Corinthian, provided an insurance policy to back a limited payment guarantee that became a feature of the Viking/Corinthian loan program. Capitol Resource Funding (Capitol) is a financial services company which factors receivables and purchases commercial paper. Capitol purchased auto loans through the Viking/Corinthian loan program. LSI Financial Service, Inc. (LSI) and Granite Finance Corporation (Granite) serviced the loans

purchased by Capitol through the Viking/Corinthian loan program.

In April 1992, Viking and Corinthian entered into an agreement (the Viking/Corinthian Agreement) that defined the roles of each of the parties with reference to the loan program. Attached to the Viking/Corinthian agreement as an exhibit was a form contract, herein called the skip default agreement. The skip default agreement, which was to be issued by Viking to purchaser/lenders such as Capitol, was intended to protect the purchaser/lenders from loss by providing a limited guarantee of payment of indebtedness on the installment loans. Under the terms of that agreement Viking, then Corinthian, then Homestead, were obligated to reimburse Capitol under the terms of that agreement as to defaulted loans. The Viking/Corinthian agreement also provided for the establishment of a claims reimbursement trust account and the administration of claims under the skip default agreement. The skip default agreement was to be backed by an insurance policy issued by Corinthian's affiliate, Homestead.

In the Spring of 1993, an individual by the name of David Lohoefer approached Capitol and represented himself as an experienced auto finance person who would be able to locate commercial paper relating to the purchase of automobiles. Capitol told Lohoefer that it would prefer to purchase commercial paper that was backed by some form of insurance that would protect Capitol against loss.

In April 1993, Lohoefer introduced Capitol to Viking. Lohoefer told Capitol that Viking was knowledgeable in the purchase

3

and sale of auto installment loan contracts. Subsequently, Viking, Corinthian and Capitol entered into an agreement (the Viking/Corinthian/Capitol agreement) relating to Capitol's purchase of installment loans through the Viking/Corinthian loan program. Viking and Capitol also entered into a separate contract, which has been dubbed herein as the Purchase and Sale agreement. Many of the terms of these agreements were negotiated by Lohoefer as intermediary. Near the same time, Capitol expressed its preference to work with someone other than its contact at Viking. Thereafter, Lohoefer and an individual named Robert Parma formed Onyx to manage the Viking loan program.

Lohoefer also introduced Capitol to LSI, representing that LSI could service the large number of loans Capitol was proposing to buy through the Viking loan program. At some point, Viking, Capitol, and LSI entered into a contract providing that LSI would service the loans sold by Viking to Capitol (the LSI Servicing agreement). Thereafter, Lohoefer intervened in the Capitol/LSI relationship, asserting that LSI was charging too much for servicing. As a result, Capitol started having the Viking loans serviced through Granite. Most of the loans form the basis of the disputes in this case were serviced by Granite.

The basic arrangement embodied in the various agreements provided that Viking would secure or purchase installment loan contracts on used automobiles from various dealers. Viking would then provide certain underwriting functions to ensure that the loans met criteria established by Viking, Corinthian and Capitol.

4

Once approved, Viking would forward the loan package to one of the loan servicers. The servicer would review the loan package to make sure that it included pertinent documentation. If the loan package was complete, the servicer would contact Capitol, and Capitol would fund the loan, completing Capitol's purchase of the commercial paper. Capitol paid a discounted percentage of the loan's face value for the contract. Viking/Onyx was to locate the loans, and provide certain underwriting functions. Viking also assumed certain contractual duties pursuant to the various agreements with respect to defaulted loans, including the duty to repossess if necessary, and certain duties relating to the processing of claims under the skip default agreement. In exchange, Viking and Onyx were entitled to a two percent commission to be paid by Capitol.

Between June 1993 and January 1994, Capitol purchased approximately 403 loans through the Viking loan program. The relationship between Viking and Capitol was plagued by various uncertainties from the beginning. The form contracts used for many of the agreements were unworkable. Many terms were inadequately memorialized. Those that were memorialized were frequently, or as the bankruptcy court stated "continually," changed or abandoned by the parties. Thus, at the bench trial before the bankruptcy court, many of the most basic rights and obligations governing the relationships between the parties were in dispute.

The Viking/Capitol relationship became completely unsupportable once a large number of the loans, 283 as of the time of trial, started going into default, and Capitol sought to file

5

claims under the skip default agreement. Viking failed to perform its contractual duty to repossess as to the vast majority of the vehicles at issue, and Capitol then undertook to perform that duty. As vehicles were repossessed the servicer, Granite, issued notices that Capitol intended to sell the vehicles to liquidate the indebtedness. There is no dispute that Viking received those notices. The notices issued by Granite stated that the sale would be held at a certain date and time. However, the vehicles were not sold at that time. Instead, Capitol liquidated the collateral by waiting until after the date certain had passed and then selling the vehicles to its affiliate, Route One Auto Sales. Route One Auto Sales, which was in the business of marketing used cars, sold the collateral in the ordinary course of business. The sale of the collateral failed to fully satisfy the indebtedness and all parties to the Viking loan program were dissatisfied in some measure with this resolution. Several lawsuits developed as a result.

## II.

In May 1994, Viking sued Capitol, Granite, Corinthian and Homestead in the United States District Court for the Northern District of Texas. About the same time, Capitol sued Viking, Onyx, and Corinthian in Virginia state court. That action was subsequently removed to the United States District Court for the Eastern District of Virginia. The following month Onyx sued Capitol in Texas state court. That action was subsequently removed to the United States District Court for the Northern District of

6

Texas.

In July 1994, Viking filed a Chapter 11 bankruptcy case in the bankruptcy court for the Northern District of Texas. In October 1994, Corinthian removed the three suits pending in the Northern District of Texas and the Eastern District of Virginia to the Bankruptcy Court. In January 1994, the bankruptcy court consolidated the three actions and ordered that the case proceed as an adversary proceeding in Viking's Chapter 11 bankruptcy.

The consolidated cases were tried to the bench in a lengthy trial that involved several hundred exhibits. The parties disputed virtually every material issue. The pretrial order, which ran in excess of one hundred pages, contained only three pages of stipulated facts. Trial was concluded in October 1995. In February 1996, the bankruptcy court entered a one hundred and eight page memorandum opinion disposing of most issues in the case. In May 1996, the bankruptcy court entered a second memorandum opinion amending some findings in response to post-trial briefing by the parties, and disposing of the remaining issues. On May 17, 1996, the bankruptcy court entered final judgment. The bankruptcy court's judgment, in relevant part, awarded Viking and Onyx $108,508 on their claims that Capitol owed additional commissions. The bankruptcy court also awarded Viking $55,236 in attorney fees. The bankruptcy court awarded Capitol more than $2,000,000 on its claims that Viking and Onyx violated the Texas Deceptive Trade Practices Act (DTPA) by engaging in deceptive practices relating to the underwriting guidelines established by the parties for the

7

program. The bankruptcy court reduced that award, however, by the amount Capitol received in payment from Route One Auto Sales for the vehicles, by the amount of commission Capitol owed to Viking and Onyx, by the award of attorney fees in Viking's and Onyx's favor, and by several other amounts relating to a final accounting of the program. The bankruptcy court also awarded Capitol $322,273.92 in attorney fees, and a portion of its costs. As a result of Capitol's larger recovery, Viking received no net recovery, for either commissions or attorney fees.

The parties, in various configurations, appealed the decision of the bankruptcy court to the district court pursuant to Bankruptcy Rule 8001 and 28 U.S.C. § 158(c). The district court affirmed. Viking, Capitol and Corinthian Management all filed notices of appeal or cross-appeal to this Court. On motions by the parties, this Court dismissed Corinthian and narrowed the issues for consideration on appeal. As a result, the only parties to this appeal are Viking and Capitol. The only issues to be resolved are those relating to the bankruptcy court's disposition of those entities' claims against each other. Specifically, Viking claims (1) that the bankruptcy court erred by holding that Capitol provided sufficient notice under Texas Business and Commercial Code § 9.504 to recover for the deficiency between the balance on the defaulted loans, and the amount realized from the sale of the collateral; (2) that the bankruptcy court erred by permitting Capitol to recover damages under the DTPA for conduct that amounted to nothing more than an ordinary breach of contract under Texas

8

law; (3) that the bankruptcy court erred in calculating the damages due to Capitol on its DTPA claim; and (4) that the bankruptcy court erred by offsetting commissions and attorney fees owed to Viking against the DTPA damages awarded to Capitol. We address each of these contentions in turn, eventually concluding that the appeal does not present reversible error.

## III.

Viking claims that Capitol recovered "in excess of $1,000,000 on its deficiency judgment against Viking." Although Viking had actual notice of Capitol's intent to sell, and although Viking breached its contractual duty to repossess and liquidate the collateral, Viking now asks this Court to reverse the "deficiency judgment" in Capitol's favor on the theory that Capitol failed to provide Viking with adequate notice of its intent to sell the collateral, as required by Texas law. We review this legal issue de novo.

Texas law provides that proper notice under Texas Business and Commercial Code § 9.504 is a condition precedent to suit for a deficiency judgment on the note after sale of the collateral. *See* TEX. BUS. & COM. CODE § 9.504; ***Greathouse v. Charter Nat'l Bank-Southwest***, 851 S.W.2d 173, 177 n.9 (Tex. 1992). But Viking's liability to Capitol is not premised upon the note, and the resulting judgment is not in the nature of a deficiency judgment. Rather, the bankruptcy court held Viking liable for violation of the DTPA based upon various deceptive practices arising out of

9

Viking's representations that it would perform certain underwriting functions and restrict participation in the program to loans that met the criteria established by the parties. Damages were calculated primarily on the basis of terms contained in the parties' skip default agreement, an agreement separate and apart from the note binding the defaulting debtors on the used car loans. Aside from the related nature of the sale, from which Viking would like the Court to draw various inferences, Viking has made no attempt to assail the considerable evidence cited in support of the bankruptcy court's conclusion that the sale was commercially reasonable. Having reviewed the available record and the arguments of the parties, we find no reversible error of fact or law in the decisions below as to this issue.

Viking next claims that Capitol's DTPA claim fails as a matter of law because it is premised upon nothing more than an ordinary breach of contract, and that the bankruptcy court made clearly erroneous findings of fact with respect to certain elements of the damage award. These issues were neither briefed to nor passed upon by the district court.[2] *See **In re Killebrew***, 888 F.2d 1516 (5th Cir. 1989) (recognizing general rule that failure to raise issue on appeal to district court precludes consideration of that issue on appeal to this Court, but finding adequate presentation of

_____

[2] Viking did include related damage issues in its lengthy designation of issues for consideration on appeal, which was filed in the bankruptcy court pursuant to Bankruptcy Rule 8006 and included more than 60 issues. Viking did not, however, pursue those issues on appeal to the district court by providing any argument, supporting authority, or record citations in support of its position.

abandonment issue in that case). We have nonetheless reviewed the existing record, which is deficient in several key respects, and the arguments of the parties, and conclude that neither presents any reversible error.

Finally, Viking claims that the bankruptcy court erred by including the attorney fees recovered by Viking on its claims in the total amount to be offset against Capitol's larger recovery. Viking claims that the bankruptcy court should have ordered that Viking's special counsel for purposes of the adversary proceeding be paid separately, and without regard to the fact that Viking was not entitled to any net recovery on its claims. Once again we disagree.

Viking claims that it "did not have the ability to freely select its own counsel," implying that it had no choice with respect to counsel that the bankruptcy court "appointed" to represent Viking's interests in the adversary proceeding. That assertion is plainly false. Viking, on its own motion, asked the bankruptcy court to permit the Abernathy Firm to continue representation in the adversary proceeding, despite potential conflicts relating to the Abernathy Firm's past representation of certain Viking creditors. Viking argued that counsel's special knowledge of the complex litigation justified counsel's continued representation in the matter. Paragraph 8 of Viking's Application for Appointment of Special Counsel provides for payment of the lawyers. That paragraph contains an express recognition of the fact that Viking, the bankruptcy debtor, would not be in a position

11

to either pay attorney fees or reimburse the Abernathy Firm for expenses. Subparagraph "a" provides that the Abernathy Firm would defend Viking in the adversary proceeding in exchange for a specified hourly fee, to be paid by Viking's affiliate Onyx Corporation and one of the Onyx principals, Robert Parma. Subparagraph "b" provides that the Abernathy Firm would prosecute Viking's claims against other parties in exchange for a guaranteed payment of a reduced hourly fee, to be paid by Onyx or Parma, and twenty-five percent of any "net recovery" by Viking on its claims against other parties. The bankruptcy court granted Viking's application, approving the Abernathy Firm's continued representation in the adversary proceeding "on the terms stated in the Debtor's application."

Viking now suggests that the bankruptcy court, by granting Viking's application to continue with the Abernathy Firm notwithstanding potential conflicts constitutes an independent "appointment" of special counsel by the bankruptcy court. Thus, Viking maintains that the bankruptcy court assumed an equitable duty to ensure that counsel was paid first from the fruits of Viking's claims to the detriment of Capitol with respect to its larger recovery. We find no basis for Viking's position. Viking's own motion clearly anticipates that the Abernathy Firm will be paid only from any "net recovery." The attorneys have presumably been paid the guaranteed hourly rates, and have recourse against those parties guaranteeing the rates in the absence of such payment. Neither Viking's application for appointment of the Abernathy Firm

12

nor the bankruptcy court's order approving that application make any mention of the notable proposition that Capitol will be required to forgo part of its recovery to provide payment of what is in essence a contingency fee to Viking's lawyers. There is no indication that Viking has formally assigned its right to recover attorney fees directly to the attorneys. Moreover, Viking has not advanced any more developed argument in support of its position than that mentioned above. We reject Viking's contention that the bankruptcy court's participation "in the employment and approval of counsel" rendered the bankruptcy court's decision to offset Viking's award against Capitol's larger award an abuse of discretion. Neither Capitol nor the bankruptcy court are the guarantors of Viking's attorney fees. The district court's decision affirming the bankruptcy court's judgment is affirmed.

This Court has spent considerable time pouring through an obviously deficient record attempting to piece together the required information to support an informed disposition of this appeal. Having concluded that exercise, the Court concludes that there is simply an insufficient basis for finding any reversible error in either the findings of fact or the conclusions of law set forth in the decisions below.

Accordingly, the district court's decision affirming the judgment of the bankruptcy court is in all respects AFFIRMED.